Earnest WASHINGTON, Appellant,

v.

The STATE of Texas, Appellee.

No. 38425.

Court of Criminal Appeals of Texas.

Oct. 4, 1965.

Francis L. Williams, Houston, for appellant.

Frank Briscoe, Dist. Atty., Carl E. F. Dally, James C. Brough and Daniel P. Ryan, Jr., Asst. Dist. Attys., Houston, and Leon B. Douglas, State's Atty., Austin, for the State.

BELCHER, Commissioner.

The conviction is for murder; the punishment, ten years.

The appellant owned two houses which were located on adjoining lots. He occupied one and Jonathan Hadnot and Jessie Marie Dickson lived together in the other, as tenants. On the day of the shooting, when Jessie paid the past-due rent money to the appellant, he asked that they move and offered to return the money if they would do so and leave the house in good condition. About 9 P.M., Hadnot's mother, Mildred Lee Smith, and his foster grandmother, the deceased, went in the deceased's automobile to help Hadnot and Dickson move. The house was soon vacated. When the appellant came to inspect the house and said something about its being dark, the deceased replied that "A person could get a match and see better." Appellant then said he would get a light bulb of his own and left, going to his house and returning with a bulb. Dickson forgot to take the light bulb from the living room when she left and on her return to the house the appellant gave her the bulb with the warning that it was probably hot. After Dickson and Smith had gotten in the car, parked in front of the house and beside which the deceased, with only the car keys in her hand, was standing on the passenger side, which was next to the house, the appellant came from the house toward the car.

The witness Mildred Lee Smith testified in part as follows:

"A. After we got in and she (deceased) was fixing to come around he (appellant) said something to her.

"Q. Did you hear what he said to Victoria Thomas (deceased)?

"A. No, sir, I didn't but she said to him, what I heard her say to him was well, Mr. Washington, (appellant) I hope you don't treat the next people you get in your house like you did my son Johnny. That's what I heard her say.

"Q. After she said that, what next happened?

"A. She turned to get around in the car and she had her back to him and he had a gun. I said oh, Mamma, he's got a gun. He shot the first shot and he missed.

\* \* \* \* \* \*

"Q. And so she ran around the front of this car?

"A. Yes, sir.

"Q. What was Earnest Washington doing?

"A. He was following her.

"Q. What did he do?

"A. He shot her again as she went to turn to come in the door and he shot again as she got to the back of the car. \* \* \* in the street, and \* \* \*

"A. She fell when she got back of the car.

"Q. After she fell then what did the defendant, Earnest Washington, do?

"A. He stood over her and shot another time.

"Q. Did you see that?

"A. Yes, sir.

"Q. And you mean after she was on the ground he shot her again?

"A. He stood over her and shot her.

"Q. How many shots did you count in all?

"A. Three or four.

"Q. Now, after he shot her this last time and when she was on the ground, what did you do?

\* \* \* \* \* \*

"A. I said oh, Mr. Washington, when I come out of the car and he

pointed the gun at me like this and pulled the trigger and nothing happened.

"Q. After this happened, what did he do?

"A. He walked on in his house like nothing happened."

\* \* \* \* \* \*

"Q. Let's back up a little bit. Back before the first shot was fired, did Victoria Thomas make any move toward this defendant?

"A. No, sir, she wasn't. She was running from Mr. Washington.

"Q. Did she move her hands toward him in any threatening manner?

"A. No, sir.

\* \* \* \* \* \*

"Q. Was she shot again at that point?

"A. She was shot, it looked like, every time she turned."

Jessie Marie Dickson testified that she saw the appellant shoot the pistol four times as the deceased moved around the car, and also heard the fifth shot, which was fired from the rear of the car. Her testimony is substantially the same as that of the witness Smith.

When Officer Sawell arrived at the scene of the killing, the appellant delivered to him the .38 caliber pistol containing five spent shells, telling Sawell that he had used it in shooting the deceased. At the time the pistol and shells were introduced in evidence the appellant stated that he had "no objection" thereto.

Dr. Jachimczyk testified that from an autopsy which he performed upon the body of the deceased he determined that a gunshot wound in the left chest caused her death; and that there were three other gunshot wounds in the body, two of which passed through. He further testified that an anaylsis of her blood showed that it contained no alcohol or narcotics.

Testimony was introduced as to the voluntary nature of appellant's written statement showing that the statute applicable thereto had been complied with. When the statement, in part, was introduced by the state, the appellant, through counsel of his selection, stated that he had "no objection." At this time the trial judge directed that the record show, as it does, that the appellant, through his counsel, had no objection to the admission of the statement in evidence and it was so admitted.

The statement reads in part as follows:

\*     \*     \*     \*     \*     \*

"Tonight after dark after they had finished moving Jessie Hadnot come over to the house and told me that they had finished moving and wanted me to come over and inspect the house. \* \* \* I went in and looked at the house \* \* \* as I come out the door and noticed that they were setting in the car and it was parked right in front of the walk gate. \* \* \* I was started out so I come on out of the yard \* \* I don't know how many times I shot her, I shot as long as it would shoot. I don't know where I was hitting her. \* \* \* When they (officers) got there I \* \* \* gave one of them the gun."

From an examination of the pistol admittedly used by the appellant to shoot the deceased and a bullet identified as one removed from the body of the deceased, a firearm and ballistic examiner testified that the bullet had been fired from the pistol.

A chemist testified that in making a "distance determination test" he found nitrate particles on the right chest portion of the dress the deceased was wearing at the time she was shot. He expressed the opinion that the muzzle of the pistol was approximately three feet from that part of the dress at the time it was fired.

Testifying in his own behalf, the appellant stated that about 4 P.M. Hadnot had cursed him when he asked him to move; that he later refused to accept fifty cents which Smith offered in payment of a rent sign Hadnot had torn off the house; and that he (the appellant) showed them the damage to his fence as the deceased stood in the back door. On appellant's return to inspect the house about 10 P.M. Smith and the deceased were standing in the doorway. When appellant asked if this was the "only light" in the house, the deceased said "Damn it, strike a match," and he replied that he would go home and get another light bulb so he could see the whole house, which he did, and, finding it in good order, returned the rent money to Jessie. Moments later, Jessie came back from the car for a light bulb, which he gave her with the warning that it was hot. As appellant was walking toward the yard gate to lock it he saw the deceased get out of the car "With her hand down with something in it coming toward me," saying, "Damn it, I got property and you can't do my son like that." Appellant testified further as follows:

"Q. What happened after she said that?

"A. Well, quite natural, I had had trouble with the son she was talking about and I figured—I knew she ought to have done been gone. I wasn't looking for them out there at that time of the night and, well, I was afraid. I was scared for my life. As she come to me cussing me about she's got property and I can't do her son that a way—see what I'm talking about—I can't—I don't know. I was afraid for my life because of the fact I knew what Jonathan Hadnot had already started, you understand, and I knew from what she said this was her son."

\*     \*     \*     \*     \*     \*

"Q. Now, you fired how many times, Mr. Washington?

"A. Just as many times as it would shoot I fired and I think it fires five times, because I was afraid."

On cross-examination the appellant testified that he owned the pistol introduced by the state, that he always kept it loaded, and put it in his pocket on the date in question because he thought he might have trouble with Hadnot when he went to his rent house; that as he walked from the house after inspecting it, the deceased got out of the car and was coming toward him and he thought she had something in her hand; and that he shot at and pursued her around the car, continuing to shoot as long as the pistol would fire. He denied shooting her at a distance of less than six feet or that he shot her while standing over her after she fell, claiming that after the last shot he went into the house and notified the officers.

■ The evidence is sufficient to sustain the conviction for murder with malice.

■ Appellant insists in his brief that the trial court should not have allowed testimony by the witness Christian as to nitrate particles on the dress of the deceased in that such testimony was highly "inflammatory"; and further, that the witness should not have been allowed to testify "as to his opinion as to relative position of the parties and distance between them."

The testimony of Officer Christian pertaining to appellant's contentions was, in part, as follows:

"Q. What type of test did you run on it? (dress of deceased)

"A. What is known as a distance determination test.

"Q. Would you explain briefly for the benefit of the jury exactly what that is?

"A. The test is to determine whether or not there are nitrate particles present and if so at what distance the bullet was fired."

\*     \*     \*     \*     \*     \*

"Q. In running your test did you find any nitrate particles on the clothing of the deceased?

"A. Yes, sir.

"Q. When running a distance test on the garment worn by the deceased, in this test were you able to ascertain how far the pistol had to have been away from the dress at the time the shell was fired?

"A. Yes, sir, I did.

"Q. And how far would that be?

"A. Approximately three feet."

\*     \*     \*     \*     \*     \*

"Q. Was there any pattern on this garment?

"A. Yes, sir. The nitrate particles create a pattern.

"Q. Was there any bullet holes on this dress worn by the deceased?

"A. There was a bullet hole in the right chest and this is where the nitrate particles were found—"

"APPELLANT'S ATTORNEY: I would like to object to the bullet holes on the dress. I believe there is testimony here already and I believe this is inflammatory and it serves no good purpose.

"THE COURT: They haven't offered the dress.

"STATE'S ATTORNEY: We did not intend to offer the dress."

No objections were made to the testimony that the dress revealed nitrate particles, or to the testimony as to the position of the parties and the distance between them. The dress was not admitted in evidence. The admission of the evidence complained of in appellant's brief in light of the record was not error.

There are no formal bills of exception or objections to the Court's charge.

The evidence is sufficient to support the conviction for murder with malice, and no error appearing, the judgment is affirmed.

Opinion approved by the Court.